UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JOHN A. KUPKER, an individual,

         Plaintiff,

   v.

AETNA LIFE INSURANCE COMPANY, a
Connecticut corporation,

         Defendant.

CASE NO. C04-106C

ORDER

     This matter comes before the Court on Defendant's Motion for Summary Judgment (Dkt. No. 24) and Plaintiff's Motion for Summary Judgment (Dkt. No. 34). The Court has reviewed the pleadings submitted by the parties and determined that oral argument is not necessary. The Court hereby finds and rules as follows.

## I. BACKGROUND

     Plaintiff John Kupker, a migraine sufferer, was employed by the Boeing Company for 18 years, working most recently as a Computer Systems Analyst. He participated in Boeing's short-term and long-term disability plans, both of which were administered by Defendant Aetna Life Insurance Company. Plaintiff applied for and received the maximum benefits under the short-term disability plan. He also applied for, and at first received, long-term disability benefits. Defendant, however, reviewed Plaintiff's

ORDER – 1

1   continuing status as totally disabled, and ultimately concluded that despite the fact that Plaintiff has been

2   diagnosed with severe headaches, there was insufficient supporting evidence in the administrative record

3   to conclude that Plaintiff's diagnosis manifests in symptoms that prevent Plaintiff from performing the

4   material duties of his own sedentary occupation or even from performing the material duties of "any

5   reasonable occupation."  Plaintiff appealed this decision, but Defendant upheld its denial of further

6   benefits.  Plaintiff then filed this Complaint, urging the Court to find that he is totally disabled from

7   performing both his own sedentary occupation as a Computer Analyst for Boeing, and from performing

8   "any reasonable occupation" as a result of his migraines.  Plaintiff's only remaining claim in this matter is

9   for the recovery of long-term disability benefits under ERISA, 29 U.S.C. § 1132(a)(1)(B).  Both parties

10  now move for summary judgment on this claim.

11  **II. OVERLENGTH BRIEF**

12          Plaintiff filed a 57-page brief in opposition to Defendant's Motion for Summary Judgment.  This

13  clearly exceeds the page limit set forth in Local Rule CR 7(e)(3).  In response Defendant moves to strike

14  pages 25 to 57 of the brief.  Plaintiff counters that the brief serves as both Plaintiff's Response to

15  Defendant's Motion for Summary Judgment and his legal memorandum in support of his own Motion for

16  Summary Judgment, thus entitling him to 48 pages. (*See* Resp. at 56 fn 24.)  Plaintiff's justification for

17  doubling the page limit is at odds with his requested relief.  First, if both parties move for summary

18  judgment on the same evidentiary facts and on the same issues and theories, the parties effectively

19  stipulate that there is no genuine issue of material fact.[1]  73 Am. Jur. 2d *Summary Judgment* § 43 (2001).

20  Plaintiff, thus, defeats his own argument that this matter should proceed to a bench trial.  (*See, e.g.*, Resp.

21  at 3-4.)  Second, the Court is required to consider each motion for summary judgment separately.  *Fair*

22  *Hous. Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).  By

23

24          [1]  The Court notes, however, that this "does not vitiate the court's responsibility to determine whether disputed issues of material fact are present."  *Fair Hous. Council of Riverside County, Inc. v.*

25  *Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

26  ORDER – 2

1   combining his Response with his Memorandum in Support of his Motion for Summary Judgment,

2   Plaintiff has made such a separate analysis nearly impossible.  Thus, the Court construes Plaintiff's

3   Response to be just that, a response.  As such, it clearly violates the page limitations set forth in the local

4   rules.

5        Moreover, the overlength brief was filed without Court approval in violation of the plain language

6   of Local Rule 7(f).  These clear violations of the local rules are grounds to decline consideration of the

7   excess pages in Plaintiff's brief.  *King County v. Rasmussen*, 143 F. Supp. 2d 1225, 1227 (W.D. Wash.

8   2001).  Although the Court is inclined to disregard all briefing beyond page 24, such a ruling in this case

9   would be devastating to Plaintiff because his entire legal argument begins at page 37 of his Response.

10   This result must be balanced with the general preference that matters be adjudicated on the merits.  Thus,

11   to adjudicate this matter on the merits requires the Court to act with a great deal of leniency and consider

12   all of the briefing[2] presently before it.  Defendant's Motion to Strike (*see* Reply at 2) is DENIED.

13   Plaintiff is cautioned against using such a briefing tactic in the future.

14   **III.  FACTS**

15        A.  Plaintiff's Long-Term Disability Plan

16        Plaintiff became a participant of a fully insured long-term disability plan ("LTD Plan") under

17   which Defendant acted as claim administrator and was the named claim fiduciary for review of denied

18   claims.  (Admin. R. 308-336.)[3]  The LTD Plan provides disability benefits for a participant's period of

19   total disability.  The LTD Plan defines "total disability" or "totally disabled" to mean:

20        during the first twenty-four months of any one period of disability, that the employee is

21

22      [2]  Even though the Court characterizes Plaintiff's Motion for Summary Judgment as merely a
response to Defendant's Motion for Summary Judgment, the Court will include Plaintiff's Reply Re

23   Motion for Summary Judgment in its considerations.

24      [3]  The Court shall refer to the Administrative Record, attached as Exhibit A to the Declaration of
Maryanne M. Barry in support of Defendant's Motion for Summary Judgment and Bates stamped as

25   "AET/KUP 000001-000336," as "Admin. R. 1," *et seq.*

26   ORDER – 3

1
2
3

> unable, solely because of disease, accidental bodily injury, or pregnancy-related condition,
> to perform the duties of his own occupation or other appropriate work made available by
> his Participant Employer; and thereafter during the continuance of such period of
> disability, that the employee is unable, solely because of disease, accidental bodily injury,
> or pregnancy-related condition, to work at any reasonable occupation.

4    (Admin. R. 312.)  An employee's period of total disability ends on the first to occur of, *inter alia*: the

5    date the employee is no longer totally disabled; and/or the date the employee fails to furnish proof of the

6    continuance of total disability.  (Admin. R. 336.)

7          B.  Defendant's Preliminary Grant of LTD Benefits

8          On October 22, 1998, Defendant received a LTD disability claim notice alleging that Plaintiff was

9    totally disabled due to "severe headaches" with an "unknown" return to work date.  (Admin. R. 172.)  On

10   November 5, 1998, Defendant received an Attending Physician's Statement ("APS") dated October 30th

11   from Dr. Wesley L. Terasaki, an internal medicine specialist, providing a diagnosis of "headaches, nausea,

12   blurred vision" and noting that Plaintiff had a "normal" head CT scan in February of 1998.  (Admin. R.

13   174-75.)  Dr. Terasaki noted that there were "no objective findings" to support Plaintiff's disability claim.

14   (*Id*.)  Dr. Terasaki then provided a "fair" prognosis and stated that Plaintiff would be able to return to his

15   own job or occupation.  (*Id*.)  However, Dr. Terasaki remarked that Plaintiff's two other treating

16   physicians "may be better qualified to assess [Plaintiff's] disability."  (*Id*.)

17         On November 18, 1998, Defendant sent a letter to Plaintiff advising him that Aetna had received

18   Plaintiff's application for LTD benefits.  (Admin. R. 171.)  Because Defendant found Dr. Terasaki's APS

19   form to be insufficient to support Plaintiff's LTD claim, it requested further medical records and

20   supporting information from Plaintiff's identified treating physicians.

21         In response to this request Defendant received additional medical records from Dr. Terasaki on

22   December 8, 1998.  (Admin. R. 146-59.)  The records provided by Dr. Terasaki included the results of

23   blood tests for blood cell count, liver, potassium/electrolytes, kidney, thyroid and blood sugar.  (*Id*.)  Dr.

24   Terasaki noted that the "labs all look normal."  (Admin. R. 155.)  The records also included the results of

25   a head CT scan conducted on February 11, 1998, by Dr. Terasaki, which he noted were normal.  (Admin.

26   ORDER – 4

R. 158-59; 174-75.)  Dr. Terasaki recommended Plaintiff follow up on his headaches with Dr. Steward J. Tepper, and noted "I will defer to Dr. Tepper regarding therapy, as I think Plaintiff's condition is more complicated than I can manage at this time."  (Admin. R. 149.)

On March 1, 1999, Defendant received medical records from Dr. Tepper, a neurologist at the PolyClinic.  (Admin. R. 125-32.)  The records from Dr. Tepper included notes from a "neurologic consultation" dated February 6, 1998.  (Admin. R. 129-31.)  In the consultation notes, Dr. Tepper remarked that plaintiff's headaches "began in early childhood but really became severe around age 23" and now occur twice-monthly and last up to four or five days.  (Admin. R. 129.)  Dr. Tepper then recommended that Plaintiff reduce his caffeine intake, changed Plaintiff's preventative and abortive medications and treatments, and recommended seeing Plaintiff in three months to do an "additional complete neurologic examination [...]."  (Admin. R. 130.)

The next set of notes from Dr. Tepper are from a visit on November 9, 1998.  They indicate that Plaintiff was having "dull" headaches on a daily basis and "severe pain" lasting up to two days once a week, along with "episodes of vertigo" one or more times a day.  (Admin. R. 127-28.)  There is no evidence of a complete neurologic examination of the type suggested by Dr. Tepper's February 6 notes (*Id.*), however he did indicate a number of follow-up procedures to be performed later to rule out certain conditions.  Dr. Tepper indicated that he would get an MRI on Plaintiff to rule out an "acoustic neuroma" (i.e., a benign tumor).  (Admin. R. 127.)  If the MRI came out negative, Dr. Tepper then suggested that Plaintiff see an ear, nose and throat specialist, Dr. Jan Zemplenyi, about the possibility that Plaintiff could have Meniere's (a disease resulting in, inter alia, vertigo).  (*Id.*)  The progress notes indicate that Dr. Tepper planned to see Plaintiff in another four months.  (*Id.*)

Based on these records Defendant preliminarily approved Plaintiff's LTD claim on March 2, 1999.  (Admin. R. 122.)  Defendant provided a letter to Plaintiff advising him of the approval on March 12, 1999.  Plaintiff was sent disability benefits for the period from August 11, 1998 through February 28, 1999, under separate cover and apprised that future payments would be mailed to Plaintiff as long as

ORDER – 5

1   Plaintiff continued to remain "totally disabled" under the LTD Plan.  (Admin. R. 120-21.)

2       C.  Defendant's Continuing Review of Plaintiff's Status as "Totally Disabled"

3       Following the preliminary approval, Defendant sent three separate requests, dated March 19, May

4   7 and July 21, 1999, for current medical information from Plaintiff's "current medical provider" showing

5   that Plaintiff remained "totally disabled."  (Admin. R. 118; 117; 115.)  In response to these requests,

6   Plaintiff provided further information on August 5, 1999, by submitting an APS from Dr. Terasaki.

7   (Admin. R. 111-12.)  The APS identified a diagnosis of migraine headaches, listing subjective symptoms

8   as "headaches" and objective symptoms as "none."  (*Id*.)  Under "limitations," Dr. Terasaki listed "cannot

9   work because of daily headaches" and under "prognosis," Dr. Terasaki listed Plaintiff's prognosis as

10  "poor" and estimated that his maximum medical improvements would occur in 3-6 months with an

11  unknown return to work date.  (*Id*.)  No supporting medical documents were attached to the APS form.

12      Defendant states that based on this information it decided to keep the claim open and sent the

13  records to an RN for a medical review.  On December 19, 2000, the RN who conducted the medical

14  review noted that there was no follow-up information from Dr. Tepper's proposed complete neurological

15  examination and suggested getting updated medical records to determine Plaintiff's current medical

16  prognosis.  (Admin. R. 110.)

17      D.  The Standard of Review Changes

18      Plaintiff's LTD Plan contains a provision which requires that for benefits to continue beyond 24

19  months from the original date of injury, Plaintiff must be unable to perform the material duties of "any

20  reasonable occupation."  (Admin. R. 107; 312.)  While Defendant's investigation into Plaintiff's

21  continued disability was pending, the new "any reasonable occupation" standard came into effect.

22  Accordingly, on January 22, 2001, Defendant invoked its right to continue its investigation and to

23  reevaluate Plaintiff's claim under the higher "any reasonable occupation" standard of the LTD Plan.

24  (Admin. R. 107-08.)  Defendant requested an APS form from Plaintiff's "attending physician," as well as

25  "any additional information to support [Plaintiff's] inability to perform the material duties of any

26  ORDER – 6

1  reasonable occupation" for Aetna's review, along with a completed Work History and Education form.

2  (Admin. R. 107-08.)

3        Plaintiff then provided an updated APS from Dr. Terasaki.  It listed a diagnosis of "hypertension

4  and asthma" with subjective symptoms of "shortness of breath" and objective symptoms of "BP 150/100"

5  and noting that Plaintiff had "improved."  (Admin. R. 73-74.)  Dr. Terasaki did not fill out the

6  "limitations" and "physical impairment" sections of the APS form.  (*Id.*)  Rather, he stated that "[p]atient

7  is disabled because of his headaches" and referred to Dr. Singer for questions on disability, limitations and

8  impairment.  (*Id.*)

9        Plaintiff provided an APS from Dr. R. Steven Singer dated April 19, 2001, identifying a diagnosis

10 of intractable headaches and sleep apnea and referring to "attached records" to provide subjective

11 symptoms of the diagnosis.  (Admin. R. 57-58.)  Dr. Singer identified Plaintiff's impairment as "Class 5"

12 or incapable of sedentary activity.  (*Id.*)  He referred to the "dictation attached" to provide further

13 information on Plaintiff's "limitation."  (*Id.*)  There were no dictations or records attached.

14       Plaintiff also provided an APS from Dr. Patrick M. Campbell, who treated Plaintiff for his

15 arthritis.  (Admin. R. 76-77.)  Dr. Campbell noted that Plaintiff had "stabilized," and identified Plaintiff's

16 physical impairment "from the point of view of arthritis" as "Class III [sic]," or a "slight limitation of

17 functional capacity; capable of light work."  (*Id.*)  Dr. Campbell made no reference to Plaintiff's

18 headaches.

19       Finally, Plaintiff provided an APS from Dr. A. J. Cole, a physical medicine and rehabilitation

20 specialist at the Northwest Spine & Sports Physicians center.  (Admin. R. 60-60A.)  Dr. Cole's diagnosis

21 included, *inter alia*, both "rheumatoid arthritis" and "migraine headaches."  (*Id.*)  Although he stated

22 Plaintiff's progress has "improved," Dr. Cole also stated that Plaintiff's prognosis was "poor," and that

23 his physical impairment was "Class 4," limiting Plaintiff to sedentary work.  (*Id.*)  Despite these

24 observations, Dr. Cole concluded that Plaintiff could return "ASAP" to "[an]other occupation," as

25 opposed to Plaintiff's own occupation.  (*Id.*)

26 ORDER – 7

1    The record also consisted of a decision from the Social Security Administration denying Plaintiff's

2    claim for SSA disability benefits (Admin. R.  85-94), a Work History and Education Questionnaire

3    identifying a lengthy history of employment in the computing systems industry with Boeing and

4    proficiency in a variety of computer- and systems-related job skills (Admin. R. 79-84), and additional

5    personal statements from Plaintiff about his medical conditions (Admin. R. 63-71; 98-99).

6        After reviewing this additional information, Aetna terminated Plaintiff's LTD benefits under the

7    "any reasonable occupation" standard in a letter dated September 4, 2001.  (Admin. R. 52-54.)  The letter

8    briefly summarized the APS forms from Doctors Cole, Terasaki, Campbell and Singer.  (*Id.*)  Defendant

9    noted that Dr. Singer referred to documents that were not attached and recounted its efforts to obtain the

10   missing records from Dr. Singer's office, to no avail.  (Admin. R. 53.)  Finally, the letter states "the

11   objective medical information currently on file does not support that you are totally disabled from

12   performing your own occupation as a computer analyst," and subsequently informed Plaintiff that his

13   LTD benefits were being terminated.  (*Id.*)

14       E.  Plaintiff's Appeal of Defendant's Termination of Benefits

15       Plaintiff appealed the denial of his LTD claim in November, 2001.  (Admin. R. 45; 37.)  During

16   the appeals process, Aetna received the additional records referenced in Dr. Singer's APS.  (Admin. R.

17   48-51.)  These records include a "neurologic follow up" note dictated by Dr. Singer on April 19, 2001,

18   which discussed Plaintiff's "numbness of hands and feet" and "significant intractable headaches," and Dr.

19   Singer's prescribed course of treatment of these issues.  (Admin. R. 50-51.)  A second "neurologic follow

20   up" note dictated by Dr. Singer on June 18, 2001, indicated that Plaintiff has "multiple system problems"

21   and "his headaches are continuing to be a problem in the right frontal location greater than elsewhere."

22   (Admin. R. 49.)  Dr. Singer further notes that Plaintiff's "[b]lood pressure is fine" and that "[h]e has no

23   other specific neurological problems, [and] he has no other specific headache triggers he's noting."  (*Id.*)

24   Finally, Dr. Singer also provided a letter dated September 17, 2001, stating that Plaintiff has "a serious

25   problem of chronic pain which is made worse by his muscular weaknesses and arthritic disease" and "a

26   ORDER – 8

1   significant problem with chronic fatigue syndrome," and recommending that "he have continuing physical

2   therapy for treatment of all of the above issues." (Admin. R. 48.)  Missing from these additional records

3   are information regarding corresponding medical tests or examinations, or any statements as to Plaintiff's

4   ability to perform his own occupation or any other occupation.

5           After receiving these additional documents, Aetna sent Plaintiff's file to Dr. Taiwo, an

6   occupational and environmental specialist and the Consulting Disability Medical Director, for a medical

7   review. (Admin. R. 40-41.)  After reviewing the administrative file, including all the aforementioned

8   records, Dr. Taiwo concluded in his February 20, 2002 report:

9           Given his overall medical condition, I believe that he should be physically capable of at
            least sedentary work that requires exerting up to 10 pounds of force occasionally, and or a
10          negligible amount of force frequently or constantly to lift, carry, push or otherwise move
            objects.  It also requires sitting for extended periods of time, but may involve walk or
11          stand for brief periods.

12   (Admin. R. 41.)  Aetna concluded its review on appeal and upheld its denial of further benefits to Plaintiff

13   in a letter dated February 22, 2002. (Admin. R. 27-28.)  Aetna affirmed its decision that Plaintiff was not

14   totally disabled within the meaning of the LTD Plan, and advised Plaintiff that this was its final decision

15   regarding his LTD claim.  (*Id*.)

16   **IV.  ANALYSIS**

17          The parties raise two issues in their respective motions for summary judgment.  First, they dispute

18   the applicable standard of review of Defendant's denial of disability benefits.  Second, the parties dispute

19   the propriety of Defendant's denial of Plaintiff's claim for continued disability benefits.  The Court will

20   address each argument in turn.

21          A.  Standard of Review

22          Normally, summary judgment is appropriate if the pleadings, affidavits, depositions, and

23   admissions on file demonstrate that there is no genuine issue of material fact and the moving party is

24   entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  If, however, the issue in question

25   concerns the validity of a decision made under a disability benefits policy governed by ERISA, a different

26   ORDER – 9

1  standard of review may apply. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989);

2  *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999). As a threshold issue, the Court must

3  determine whether to review Plaintiff's claims under an abuse of discretion standard or under a *de novo*

4  standard.

5      Defendant argues that the Court should review Defendant's application of the LTD Plan's

6  provisions under the "abuse of discretion" standard because the Plan gives Defendant discretionary

7  authority to determine eligibility for benefits and/or to construe the terms of the Plan. Plaintiff responds

8  that the language delegating discretionary authority is found outside the plan, thus the Court should apply

9  the default standard of review for cases decided under the ERISA statute, which is *de novo* review.

10 Alternatively, Plaintiff argues that because Defendant operates under an inherent conflict of interest, and

11 because it acted in bad faith in reviewing Plaintiff's claim, the Court should consider Defendant's decision

12 to deny LTD benefits under a "less deferential" standard of review.

13     When a benefits policy explicitly gives a plan administrator discretionary authority to determine

14 participants' eligibility for benefits, courts must generally use the deferential abuse of discretion standard

15 of review to determine whether the administrator's decision to deny benefits to a participant was

16 appropriate. *Nord v. Black & Decker Disability Plan*, 356 F.3d 1008, 1010 (9th Cir. 2004). Thus, the

17 Court first addresses whether the LTD Plan gives Defendant discretionary authority to determine

18 eligibility for benefits.

19     The original plan, dated February 18, 1980, lacks any discretionary language relating to authority

20 to determine eligibility benefits. However, a letter dated April 6, 2001, designated by Defendant as

21 "Administrative Services Contract" (hereinafter "Cannon Letter"), purports to amend the original plan.

22 The Cannon Letter clearly confers discretion. In contrast to the original plan, it states:

23         Aetna...shall have discretionary authority to determine whether and to what extent
         participants and beneficiaries are entitled to benefits, and to construe disputes or doubtful
24         Plan terms. Aetna...shall be deemed to have properly exercised such authority unless
         they have abused their discretion hereunder by acting arbitrarily and capriciously.

25

26 ORDER – 10

(Admin. R.  000307.)  The Ninth Circuit has clarified that the distribution of benefits is controlled by the version of the plan in place at the time the claim for benefits is filed.  *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1159-61 (9th Cir. 2001).  Because Plaintiff made a claim for benefits under the 1980 Plan, the Court must determine whether the Cannon Letter constitutes a valid amendment to the LTD Plan.  For the following reasons the Court finds that it is not a valid amendment.

A delegation of discretionary authority must be added by amending the policy according to the policy's amendment procedures.  *Grosz-Salomon*, 237 F.3d at 1169; *Dames v. Paul Revere Life Ins. Co.*, 49 F. Supp. 2d 1194, 1201 (D. Or. 1999).  The first page of the Policy states "the Insurance Company hereby agrees with the Policyholder, subject to the terms appearing on this and the following pages of this policy (including, if any, the riders, endorsements, and amendments, to this policy which are signed by the Insurance Company), to pay benefits in accordance with the terms of this policy."  (Admin. R. 308.) More importantly, however, the Policy also provides:

> This policy may be changed at any time or times by written agreement between the Insurance Company and the Policyholder, without the consent of the employee or other person.  No change in this policy shall be valid unless approved by an executive officer of the Insurance Company and unless such approval be endorsed hereon or attached hereto. No agent has authority to change this policy or to waive any of its provisions.

(Admin. R. 331.)  Amendment thus requires both approval of the amendment by an executive officer of the Insurance Company, and endorsement within or attachment to the policy.

The Cannon Letter does not conform with these technical requirements.  The Letter is printed on Boeing letterhead, clearly states that it affects the named policies, including Plaintiff's policy, and is signed by N.B. Cannon, "Director of Employee Benefits for the Employee Benefit Plan Committee, the Plan Administrator for The Boeing Company."  However, the Letter was then accepted by W. James Rau, "National Accounts Team Leader for Aetna Life Insurance Company."  Nowhere has Defendant indicated that a "National Accounts Team Leader" is an executive officer at Aetna, and the Cannon Letter was not endorsed in the Plan or attached to the Plan.  Thus, the Court cannot construe the Cannon Letter as a valid amendment of the policy.  The fact that there is a rider attached to the policy that

ORDER – 11

1    conforms with these amendment requirements indicates that Defendant understood the proper method of

2    amending the policy.  Because there is no other discretionary language contained in the 1980 policy, the

3    Court must review Plaintiff's claims *de novo*.[4]  *See Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1089

4    (9th Cir. 1999) (stating "the default is that the administrator has no discretion, and the administrator has

5    to show that the plan gives it discretionary authority in order to get any judicial deference to its

6    decision.").

7        B.  Evidentiary Issues

8        Having determined that the appropriate standard of review is *de novo*, the Court must next

9    address what evidence it may consider in making that review.  As a preliminary matter, Defendant moves

10   to strike the Declaration of David B. Richardson submitted in support of Plaintiff's Motion for Summary

11   Judgment, and the Exhibits attached thereto, because the declaration and exhibits contain materials

12   outside the administrative record, none of which were produced to Defendant during the discovery

13   period.  Plaintiff responds that "it is disingenuous for [Defendant] to now argue that Plaintiff should have

14   made disclosures under rules it claimed in writing did not apply" (Pl.'s Reply at 6), referring to a letter

15   from Defendant contending that there should be "no discovery beyond the Administrative Record"

16   (Haushild Decl., Ex. A).

17       Fed. R. Civ. P. 26(a)(1)(B) requires parties "without awaiting a discovery request" to produce

18   certain information, including "all documents...that the disclosing party may use to support its claims or

19   defenses."  The penalty for failing to disclose this information in contained in Fed. R. Civ. P. 37(c)(1): "A

20   party that without substantial justification fails to disclose information required by Rule 26(a)...is not,

21   unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any

22   witness or information not so disclosed."  Even though Defendant attempted to limit this dispute to the

23

24       [4]  Because the Court will apply *de novo* review to Plaintiff's claims, it is not necessary for the
     Court to address Plaintiff's contention that *de novo* review is appropriate because the plan administrator
25   was operating under an apparent conflict of interest.

26   ORDER – 12

1   administrative record, Plaintiff apparently had no intention of adhering to such a limitation.  Plaintiff

2   cannot now argue that Defendant's characterization of the case prevails for purposes of discovery, and

3   simultaneously argue that its own characterization of the dispute prevails upon consideration of the

4   merits.[5]  Plaintiff has failed to demonstrate substantial justification for failing to disclose the information

5   contained in the Declaration of David B. Richardson and attached Exhibits.  The Court will not allow

6   Plaintiff to use this evidence on these cross-motions for summary judgment.

7          C.  De Novo Review

8          An administrator of a plan governed by ERISA must comply with the procedural requirements of

9   29 U.S.C. § 1133 and the regulations promulgated thereunder, specifically 29 C.F.R. § 2560.503-1.

10  ERISA requires plan administrators to "afford a reasonable opportunity for a full and fair review" of

11  adverse decisions.  29 U.S.C. § 1133(2).  This means that the claims procedure must "provide for a

12  review that takes into account all comments, documents, records, and other information submitted by the

13  claimant relating to the claim."  29 C.F.R. § 2560.503-1(h)(2)(iv) (made applicable to disability appeals

14  determinations by 29 C.F.R. 2560.503-1(h)(4)).  For the following reasons, the Court concludes that

15  Defendant did not conduct a full and fair review of Plaintiff's disability claim.

16         First, Defendant failed to obtain sufficient medical records to adequately review Plaintiff's claim.

17  The burden is on the plan administrator to obtain adequate information to make its decision.  *Booton v.*

18  *Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1464 (9th Cir. 1997)  Although this does not require the

19  plan administrator to make an exhaustive search of all of the claimant's medical records, "fiduciaries

20  cannot shut their eyes to readily available information when the evidence in the record suggests that the

21  information might confirm the beneficiary's theory of entitlement and when they have little or no evidence

22

23  ───────────────────

24         [5]  The Court further notes that this matter does not fall under the disclosure exemption set forth in
    Fed. R. Civ. P. 26(a)(1)(E)(I) for actions on an administrative record because Plaintiff's position from the
25  outset has been that it is the information that was missing from the Administrative Record that is
    important.

26  ORDER – 13

1   in the record to refute that theory." *Gaither v. Aetna Life Ins. Co.*, 388 F.3d 759, 773-75 (10th Cir.

2   2004).  The RN, who conducted a medical review of Plaintiff's records following Defendant's preliminary

3   approval of LTD benefits, noted that there was no follow up information from Dr. Tepper's proposed

4   complete neurologic examination and suggested getting updated medical records to determine Plaintiff's

5   current medical status.  Defendant did not request further medical records from Dr. Tepper. Instead

6   Defendant shifted the burden to Plaintiff to produce sufficient records to support his claim, including a

7   request for an APS form from Plaintiff's attending physician.  Plaintiff provided an APS from Dr. Singer

8   which referenced additional records that were not attached.  This reference should have put Defendant on

9   notice these records "might confirm the beneficiary's theory of entitlement." *Id*.  Yet, rather than make

10  multiple attempts to obtain Plaintiff's complete medical records from Dr. Singer, Defendant made a single

11  attempt.  When that was unsuccessful, Defendant simply terminated Plaintiff's benefits, without knowing

12  whether the information in those medical records would support Plaintiff's claim for LTD benefits.[6]  In

13  fact, the various APS forms, which do not clearly support either an award or a denial of benefits, are the

14  only medical records Defendant reviewed.  The administrative record is practically void of information

15  beyond these standardized forms, indeed Defendant even points out on several occasions in its Motion for

16  Summary Judgment where potentially useful records are missing.  Defendant's failure to request this

17  information is not consistent with the duty of a plan administrator to obtain sufficient information to

18  adequately review Plaintiff's claim.

19          Second, Defendant improperly relied on the opinions of the physicians treating Plaintiff for other

20  impairments over the opinion of the physician treating Plaintiff for the condition causing his disability - his

21  headaches.  Although Defendant is correct in observing that administrators are not required to

22  automatically give deference to the opinions of treating physicians, *see Black & Decker Disability Plan v.*

23  *Nord*, 538 U.S. 822, 834 (2003), the Ninth Circuit has held that the reliance on a generalist to contradict

---

24          [6] Since these records have been stricken, *see* discussion *supra*, the Court is not in a position to
25  speculate whether a complete medical file from Dr. Singer would support Plaintiff's claim for benefits.

26  ORDER – 14

1    the opinions of treating specialists may be arbitrary and capricious, *see Zavora v. Paul Revere Life Ins.*

2    *Co.*, 145 F.3d 1118, 1123 (9th Cir. 1998).  In the case at bar, Dr. Singer consistently repeats his

3    conclusion that Plaintiff is disabled due to his headaches.  Plaintiff's other treating physicians, Drs.

4    Terasaki, Campbell and Cole, either explicitly defer to Dr. Singer's opinion regarding Plaintiff's disability,

5    or indicate that their opinions on his physical impairment level only pertain to the conditions for which

6    they treat him, i.e. hypertension, arthritis, etc., and not to any physical impairment caused by his

7    headaches.  Thus, Defendant should not have relied on their opinions to support a finding that Plaintiff's

8    headaches do not prevent him from performing his own or any other occupation.

9            Moreover, a claimant will not be deemed to have a reasonable opportunity for a full and fair

10   review of a claim and adverse benefit determination unless "the appropriate named fiduciary shall consult

11   with a healthcare professional who has appropriate training and experience in the field of medicine

12   involved in the medical judgment."  29 C.F.R. § 2560.503-1(h)(3)(iii) (made applicable to disability

13   appeals by 29 C.F.R. § 2560.503-1(h)(4)).  Defendant argues that the "field of medicine" at issue in this

14   case is occupational medicine.  While it is true that occupational medicine is a field of medicine at issue, it

15   is not the only one.  Defendant failed to consult with a doctor experienced in neurology before

16   concluding that Plaintiff's headaches do not preclude him from performing his own or any other

17   occupation.  *See Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 538 (9th Cir. 1990) (noting that the

18   claims administrator failed to consult with any doctors who had significant experience with or particular

19   expertise concerning the mental illness at issue).  Defendant did not comply with this procedural

20   requirement under ERISA.

21           Third, Defendant failed to adequately describe to Plaintiff what information was missing from the

22   record and why such information was necessary.  *See Taft v. Equitable Life Assurance Soc'y*, 9 F.3d

23   1469, 1471 (9th Cir. 1993) (indicating that the reasons underlying a disability denial must be explained);

24   29 C.F.R. § 2560.503-1(g)(1)(iii).  For example, Defendant's Appeals Analyst indicated to Plaintiff's

25   counsel in a response to a letter sent by counsel upon the conclusion of the appeal process, "reported pain

26   ORDER – 15

1   cannot be relied upon as an indicator of functional impairment," instead it was necessary to prove a

2   corresponding pathology.  (Admin. R. 4.)  Yet, nowhere was this information communicated to Plaintiff

3   prior to the termination of his LTD benefits.  Instead the September 4 termination letter states only that

4   "the objective medical information currently on file does not support that you are totally disabled from

5   performing your own occupation."  (Admin. R. 53.)  Additionally, Defendant now asserts that the initial

6   decision to grant Plaintiff's LTD claim was based, in part, on the complete neurologic examination

7   suggested by Dr. Tepper's February 6, 1998 notes.  Plaintiff was never told he needed to produce

8   evidence of this examination to continue receiving benefits.  In sum, the Court is not satisfied that

9   Plaintiff was made aware of the information that was missing from his administrative record.

10        Finally, Defendant did not examine Plaintiff or discuss his condition with his treating physicians.

11   *See Zavora*, 145 F.3d at 1123 (indicating it was an abuse of discretion for an ERISA administrator to

12   deny disability benefits, in part, on the basis of a medical review made by a non-examining physician).  For

13   these reasons the Court concludes that Defendant did not comply with the procedural requirements of 29

14   U.S.C. § 1133.  As a result the Court will not uphold the Defendant decision to terminate Plaintiff's LTD

15   benefits.

16        On the other hand, despite the Court's findings that Defendant failed to provide Plaintiff with a

17   full and fair review of his disability claim, the Court is likewise unable to state with certainty that Plaintiff

18   is unable to perform either his own or any sedentary occupation.  The only evidence in the record relating

19   to Plaintiff's occupational capabilities is in the form of a single-line statement on the APS forms submitted

20   by each of his treating physicians.  These assessments of Plaintiff's physical impairment level are not

21   supported by an additional evidence.  Nor does Dr. Taiwo, Defendant's occupational specialist who

22   reviewed Plaintiff's claim on appeal, provide any insight into Plaintiff's capabilities. He simply restates the

23   treating physicians' conclusions and then opines that "[g]iven [Plaintiff's] overall condition, I believe he

24   should be capable of at least sedentary work."  (Admin. R. 41.)  Even Plaintiff's assertion that a finding

25   he is unable to perform his own occupation automatically means that he is unable to perform any other

26   ORDER – 16

occupation is simply not helpful when it is not supported by any citations.  Whether Plaintiff is able to perform his own occupation or any other occupation is an issue of material fact precluding entry of summary judgment in favor of Plaintiff.  *See Tremain v. Bell Industries, Inc.*, 196 F.3d 970, 978 (9th Cir. 1999).  An award of benefits would be inappropriate at this time.

**V.  CONCLUSION**

      IT IS SO ORDERED:

      (1)     Defendant's Motion for Summary Judgment (Dkt. No. 24) is DENIED;

      (2)     Plaintiff's Motion for Summary Judgment (Dkt. No. 34) is DENIED.

      SO ORDERED this ___27th___ day of April, 2005.

UNITED STATES DISTRICT JUDGE

ORDER – 17